# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                    No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup";
CHRISTOPHER GARCIA; MANUEL
JACOB ARMIJO, a.k.a. "Big Jake";
FREDERICO MUNOZ, a.k.a. "Playboy";
SERGIO LOYA RODRIGUEZ, a.k.a
"Churro"; MANUEL BENITO, a.k.a.
"Panther"; VINCENT GARDUÑO, a.k.a.
"Fatal"; MANDEL LON PARKER, a.k.a.
"Chuco"; DANIEL ARCHULETA, a.k.a.
"Smurf"; DANIEL SANCHEZ, a.k.a.
"Dan Dan"; ANTHONY CORDOVA,
a.k.a. "Antone"; RICHARD GALLEGOS,
a.k.a "Dopey"; and ARTURO ARNULFO
GARCIA, a.k.a. "Shotgun,"

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Vincent Garduno's Emergency

Motion for Compassionate Release, filed June 9, 2020 (Doc. 1250)("Motion"); and (ii) the

Amended Emergency Motion for Compassionate Release, filed June 10, 2020 (Doc.

1251)("Amended Motion"). The Court held a hearing on June 15, 2020. See Clerk's Minutes at

1, filed June 15, 2020 (Doc. 1258). The primary issues are: (i) whether the exhaustion requirement

in 18 U.S.C. § 3582 (c)(1)(A) is jurisdictional; (ii) whether the Court can excuse the exhaustion

requirement; and (iii) whether the Court can grant Defendant Vincent Garduño compassionate

release under 18 U.S.C. § 3582 (c)(1)(A), because Garduño's mother's passing, his sentence's end

date, his health condition, and the COVID-19 cases in the Otero County Prison Facility ("Otero County") where he is housed are, in the aggregate, a compelling and extraordinary circumstance warranting compassionate release.  The Court concludes that (i) it will not grant Garduño compassionate release under 18 U.S.C. § 3582 (c)(1)(A), because although Garduño fulfilled the statutory exhaustion requirement; and (ii) Garduño's circumstances may be upsetting, his circumstances do not, in the aggregate, comprise a compelling and extraordinary circumstance warranting compassionate release.

## FACTUAL BACKGROUND

The Court recounts the factual background in its Memorandum Opinion and Order at 2-4, 2019 WL 2649835, filed June 27, 2019 (Doc. 1051)("MOO").  The Court incorporates that recitation here.

> The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment").  The Court does not set forth these facts as findings or for their truth.  The Court recognizes that the factual background is largely the Plaintiff United States of America's version of events and that the Defendants who have not pled guilty are all presumed innocent.

> This case deals with the crimes that the . . . SNM . . . allegedly committed through its members.  See Indictment ¶¶ 1, 3, at 1-2.  The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Indictment ¶ 1, at 2.  The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce."  Indictment ¶ 2, at 2.  The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise."  Indictment ¶ 2, at 2.

> The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  See Indictment ¶ 3, at 2.  During the riot, thirty-three inmates were killed, and over

200 were injured.  See Indictment ¶ 3, at 2.  After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment ¶ 4, at 2.  The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for ["]table["]) of leaders who issue orders to subordinate gang members."   Indictment ¶ 4, at 2-3.  The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Indictment ¶¶ 3, 5, at 2-3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking.  See Indictment ¶ 5, at 3.  The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment ¶ 6, at 3.  If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power. See Indictment ¶ 6, at 3.  The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Indictment ¶ 7, at 4.  The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."   Indictment ¶ 7, at 4.  "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders."   Indictment ¶ 8, at 4.  To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder.  See Indictment ¶¶ 6-8, at 3-4.  The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Indictment ¶ 7, at 4.  The SNM's recent activities in a conspiracy to murder high ranking New Mexico Corrections Department ["NM Corrections Department"] officials inspired the Federal Bureau of Investigation's [("FBI")] present investigation.  See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

MOO at 2-4, 2018 WL 5980443, at *1 (alterations added).  The Superseding Indictment, filed March 9, 2017 (Doc. 371), charged Garduño, along with several other co-Defendants, with Count 1: Racketeering Conspiracy in violation of 18 U.S.C. § 1962(c).  See Superseding Indictment at 8. Garduño pled guilty to the charge.  See Judgment in a Criminal Case, filed July 24, 2019 (Doc. 1084)("Judgment").  As part of his plea, he was committed to the Federal Bureau of Prisons ("BOP") for 41 months and was scheduled to be on supervised release for three years.  Judgment at 2-3.  For one of Garduño's conditions of supervised release, the Court ordered Garduño to "not communicate, or otherwise interact, with codefendant(s)/coconspirator(s)."   Judgement at 5.

Garduño was released from BOP custody on July 30, 2019, when he began supervised release. See Second Amended Sentencing Memorandum at 1, filed March 16, 2020 (Doc. 1200)("Sentencing Memorandum").  On January 14, 2020, the Court issued a warrant for Garduño's arrest, because Garduño's urine sample tested positive for cocaine, and because he allegedly tampered with the urine collection process.  See Sentencing Memorandum at 1.  He was released on January 16, 2020, and then arrested again on February 19, 2020, after submitting another urine sample that tested positive for cocaine.  See Sentencing Memorandum at 1.  On March 2, 2020, Albuquerque Police Department ("APD") filed a traffic citation in the Bernalillo County Metropolitan Court that charged Garduño with Disorderly Conduct- Urinating or Defecating in Public View in violation of City of Albuquerque Ordinance 12-2-5(G) on February 19, 2020.  See Sentencing Memorandum at 1.  The APD reported to the USPO that, during his February 19, 2020 incident, Garduño appeared intoxicated and possessed Buphrenorphine (suboxone), and told an APD officer that he had cut off his court-ordered GPS monitor.  See Sentencing Memorandum at 2.  Garduño admitted that he was guilty of violating a mandatory condition of his supervised release, because he "failed to refrain from any unlawful use of a controlled substance" and "failed to submit to substance abuse testing to determine if he had used a prohibited substance."  Amended Judgment at 1-2, filed April 13, 2020 (Doc. 1219).  The Court committed Garduño to custody of the BOP for eight months, after which he would be on supervised release for 24 months.  See Amended Judgment at 3-4.  At the time of his hearing, Garduño had served thirty-seven days in custody and had an over-served time balance of 124 days, which could be credited to his revocation sentence pursuant to 18 U.S.C. 3585 (b).  See Sentencing Memorandum at 2.  In early June, 2020, Garduño's mother's health began to decline, and Garduño's daughter telephoned his counsel to notify counsel that Garduño's mother was expected

to pass away within the week.  See Amended Motion at 2.  Garduño's mother passed away on June

10, 2020.  See Draft Transcript of Hearing at 9:25-10:13, held June 15, 2020 (Esquibel)("Tr.").[1]

### PROCEDURAL BACKGROUND

Garduño files his Amended Motion, asking the Court to release him one week early.  See

Amended Motion at 1.  The United States originally opposed the Amended Motion, although it

did not enter any response.  See Amended Motion at 5.  The Court held a hearing on June 15, 2020,

at which the United States no longer opposed the Amended Motion.  See Tr. at 3:17-22 (Equibel).

**1.    The Amended Motion.[2]**

Garduño filed the Amended Motion.  See Amended Motion at 1.  Garduño begins his

Amended Motion by providing factual context.  See Amended Motion at 1.  He notes that he

currently is housed at Otero County, a "center of a massive COVID-10 outbreak," and the

residence of many of the co-Defendants and cooperators in Garduño's case.  Amended Motion at

1.  According to Garduño, within a few days of his transfer to Otero County, Garduño asked his

counsel to assist him in transferring out of the facility, because people associated with his case

were "threatening to get him in trouble and increase his time in custody" by falsely reporting to

authorities that Garduño threatened FBI Special Agent Bryan Acee.  See Amended Motion at 1.

See also Amended Motion at 3 (stating that the FBI has "admonished" Garduño for these reports)

In response to an inquiry, the United States Marshals Service told Garduño's counsel that it is

currently not transferring inmates.  See Amended Motion at 2.  On June 9, Garduño's daughter

---

[1]The Court refers to the Court Reporter's original version of the transcript.  Any final
transcript may contain slightly different page and/or line numbers.

[2]The Court summarizes only the Amended Motion and not the Motion, because the
Amended Motion incorporates everything in the Motion.

contacted Garduño's counsel and conveyed that Garduño's mother would likely pass away within the week.  <u>See</u> Amended Motion at 2.  Garduño's mother had been sending money to Garduño's telephone account so he could use paid telephone services, and the family was in the process of submitting more money so Garduño could speak with his mother before she passed away.  <u>See</u> Amended Motion at 2.

Garduño begins his argument by noting that, although he has not requested release from the BOP as § 3582 requires, the Court should excuse Garduño from this requirement.  <u>See</u> Amended Motion at 1.   He states that he "likely would not get relief or hear back from BOP" in the two remaining weeks of his sentence.  Amended Motion at 2.  Further, he argues, he was imprisoned in Cibola County Correctional Center from the time of his revocation hearing March, 2020, until May, 2020, and now is in Otero County.  <u>See</u> Amended Motion at 3.  Thus, Garduño argues, he has not been in BOP custody since his revocation hearing, which makes it unlikely he will be able to seek relief from the BOP.  <u>See</u> Amended Motion at 3.

Turning to Otero County's COVID-19 situation, Garduño asserts that "[b]eing in custody is not a safe place for individuals who the CDC would consider at risk for serious illness." Amended Motion at 3 (noting that prison conditions, specifically pre-trial confinement, create an environment hospitable to transmitting diseases)(citing Joseph A Bick, <u>Infection Control in Jails and Prisons</u>, 45 Clinical Infectious Diseases 8 1047-1055 (2007), available at https://doi.org/10.1086/521910).   He notes that some district courts have concluded that COVID-19's "threat" is a compelling reason to release defendants, Amended Motion at 3-4 (citing <u>United States v. Davis</u>, No. 19-cr-297-JDB (D.D.C. April 6, 2020), and other courts have waived the exhaustion requirement because of COVID-19, <u>see</u> Amended Motion at 4 (citing <u>e.g.</u> <u>United States v. Sawicz</u>, -- F. Supp. 3d --, No. 08-cr-287 (ARR), 2020 WL 1815851 (E.D.N.Y. April 10,

2020)).  Garduño argues that, because he is fifty years old, has medical conditions that the CDC states would elevate his risk of serious illness from COVID-19, and is housed at a facility with many COVID-19 cases, the Court should waive the exhaustion requirement.  See Amended Motion at 4 (citing CDC, People at Risk for Serious Illness from COVID-19, available at https://bit.ly/2vgUt1P (May 14, 2020)).

Garduño reiterates his concern that his mother's rapid decline will cause her to pass away without his presence.  See Amended Motion at 5.  He says that he has 161 days of credit for time served, which was applied to his sentence of 254 days, allowing him to be released on June 17, 2020.  See Amended Motion at 5.  He notes that the United States, but not the USPO, opposes his early release, and he asks the Court to grant him compassionate release.  See Amended Motion at 5.

2. **Transcript of June 15, 2020 Hearing**.

The Court held a hearing on June 15, 2020.  See Tr. at 1.  At the hearing, Garduño noted that he originally filed the motion, because he was housed in a facility with several people involved in his case, and because of COVID-19, but he amended his motion when he heard about Garduño's mother's illness.  See Tr. at 2:24-3:9 (Esquibel).  He acknowledged that he did not exhaust his remedies with BOP, as the § 3582 requires, but he thinks there is caselaw that would allow the Court to hear the Amended Motion regardless.  See Tr. at 3:9-13 (Esquibel).  He noted that, at this point, his release would be only two days early, and the United States does not oppose this release as long as he wears a GPS monitor.  See Tr. at 3:17-22 (Equibel).  In response to the Court's inquiry, the United States said that it is not certain whether the Court has the authority to grant the request, but the United States notes that it does not oppose the request.  See Tr. at 3:25-4:13 (Court, Armijo)(noting that it would have asked for GPS monitoring regardless of early release).  The

Court asked the United States why it agreed to early release, and the United States cited the passing of Garduño's mother and the funeral arrangements.  See Tr. at 5:8-15 (Armijo)(excluding COVID-19 as a basis for early release).  The United States further explained that Garduño is being investigated for involvement in potential threats that Defendant Carlos Herrera made, and that the target of these threats -- Brian Acee -- is agreeable to the Court releasing Garduño two days early if he is being monitored by GPS.  See Tr. at 5:16-6:3 (Armijo).  The United States noted that agreeing to the amended petition would let it forgo a contested hearing that could result in the release of names of people it is investigating.  See Tr. at 6:4-15 (Armijo).  The United States confirmed that the investigation is active, and that there are witnesses stating that Garduño was involved in the threats. See Tr. at 7:1-16 (Armijo).  The United States acknowledged that they usually would not agree to this amended petition, but that they agreed to it after weighing the release of documents relating to the ongoing investigation and the release of Garduño two days early.  See Tr. at 8:7-13 (Armijo).  It noted that the GPS monitoring would allow the USPO and, if the need arises, the FBI to know Garduño's location.  See Tr. at 8:25-9:21 (Armijo).

The Court turned to Garduño, who clarified that Garduño's mother passed away on June, 10, 2020, but that he did not learn of her passing until after he filed the Amended Motion.  See Tr. at 9:25-10:13 (Court, Esquibel). Garduño explained that the family is trying to arrange the funeral for later in the week, knowing that Garduño's release date is June 17, 2020.  See Tr. at 10:14-19 (Court, Esquibel).  Garduño then argued that the Court has authority under § 3582 to waive the exhaustion requirement "in unique circumstances."  Tr. at 11:5-11 (Esquibel).  He explained the unique circumstances in this case: Garduño is unable to transfer to his intended destination of a Texas medical facility, so he instead was housed in Cibola County Correctional CEnter and Otero County and was never in BOP custody.  See Tr. at 11:11-16 (Esquibel).  The Court asked Garduño

to clarify the standard under which he is seeking release, and Garduño clarified that he is seeking release under the "extraordinary and compelling reasons" under 3582(c)(1)(A).  Tr. at 12:6-25 (Court, Esquibel).  The Court expressed its concern with Garduño's custody argument, stating that it could result in a "huge hole through the statutory scheme," because every prisoner in New Mexico would not be in BOP custody, because there is no BOP facility in New Mexico.  See Tr. at 13:9-18 (Court).  Garduño acknowledged the Court's concern while pressing that Garduño has unique circumstances beyond not being in BOP custody.  See Tr. at 13:19-22 (Esquibel).  Garduño also states that, even beyond not being in BOP custody, he could not have met the exhaustion requirement, because his situation's exigency did not give him enough time to go through the process.  See Tr. at 14:8-18 (Esquibel). Garduño relayed a telephone conversation between Garduño and his attorney from Otero County, in which his attorney could hear individuals involved in Garduño's case yelling and insulting each other "non-stop."  Tr. at 5:19 (Esquibel).  See Tr. 5:5-19 (Esquibel)(alleging that an FBI Special Agent told Garduño's counsel that this chaotic environment was typical).  During the telephone call, Garduño relayed that cooperators in his case told him they would try to get him in trouble, although Garduño refused to name the cooperators. See Tr. at 15:21-16:1 (Esquibel).  Garduño asked his counsel to get him transferred, a request that Garduño's counsel relayed to the United States.   See Tr. at 16:1-5 (Esquibel).  The United States Marshals denied the request, citing the fact that they were not moving anyone at the time.  See Tr. at 16:6-8 (Esquibel).  Garduño explained that that situation, along with the COVID-19 cases in Otero County, precipitated the Motion, which he amended due to Garduño's mother's illness.  See Tr. at 16:12-21 (Esquibel).

Garduño discussed the investigation, noting that the United States told him that they overheard a conversation between Herrera and Garduño that was "a one way conversation,"

because Garduño has no interest in killing Acee.  Tr. at 17:15 (Esquibel).  See Tr. at 16:23-17:20 (Esquibel).  He noted that Garduño was not planning on killing Acee, which is why he was agreeable to the ankle monitor; further, Garduño argued it did not make sense that he would want to kill Acee with such a short period of time left on Garduño's sentence.  See Tr. at 17:17-18:2 (Esquibel).  Garduño expressed his concern that the United States said it would not oppose his release if he told them the truth about the investigation, because Garduño "avoids everybody and doesn't want to be seen as cooperating," "has no information for" the United States, and "hasn't been close enough in Otero County to Mr. Herrera to have a conversation like this that they're saying he had."  Tr. at 18:10-15 (Esquibel).  See Tr. at 18:4-15 (Esquibel).  Garduño noted that it was his understanding from the FBI that Garduño would not be charged with anything resulting from the investigation.  See Tr. at 18:23-19:1 (Esquibel).  He reiterated that Garduño wants to be released to start taking care of his mother's house, after which he will be in an inpatient drug treatment program.  See Tr. at 19:6-13 (Esquibel).

Garduño says that the exhaustion requirement "needs to be almost waived," because there was fewer than thirty days left on the sentence when he initially "figured all of this stuff out."  Tr. at 19:23 (Esquibel); id. at 20:1-2 (Esquibel).  See 19:22-20:7 (Esquibel).  He emphasized that, from his conversation with the United States Marshals Office, everything at the prisons is operating in a slow and clunky manner that would makes the thirty-day requirement "impractical."  Tr. at 20:14 (Esquibel).  See Tr. 20:7-14 (Esquibel).  He noted that other courts have concluded that "these things that are coming up are just too unique that this cookie cutter thing won't work" and, consequently, have waived the exhaustion requirement.  Tr. at 20:17-20 (Esquibel).  See Tr. at 20:14-21:6 (Esquibel)(noting that, had the situation arisen two month ago, it may have been practical for Garduño to meet the exhaustion requirement).  Garduño acknowledged that there

likely would be no events related to his mother's death before his release.   See Tr. at 21:25-22:3 (Esquibel).  He noted, however, that his siblings have traveled out-of-state to be with his mother, so, the longer he is imprisoned, the longer they will have to extend their stay.  See Tr. at 21:20-23 (Esquibel); see id. at 22:3-5 (Esquibel).  Further, Garduño emphasized, Garduño will need to help resolve other issues related to his mother's passing, such as probate and the house, and his siblings cannot start those processes without him.  See Tr. at 22:3-17 (Esquibel).

After offering Garduño sympathy, the Court said that it needs to decide whether it has the authority to release Garduño, and that, although it may be able to find a way to release him, it cannot look at Garduño "in a vacuum."  Tr. at 23:11-12 (Court).  See id. at 23:4-12 (Court).  The Court said that, although it has denied release in the past in COVID-19 related cases, Garduño's case "is a little different," because of his mother's death.  Tr. at 23:16 (Court).  See id. at 23:13-17 (Court).   The Court and Garduño discussed the logistics of releasing Garduño, including that Garduño is willing to get the required two COVID-19 tests before release because "there is nothing that's been done ahead of time for people's release" because of the strain on resources.  Tr. at 25:14-15 (Esquibel).  See id. at 25:11-26:11 (Esquibel, Court).  Garduño emphasized that, during the stopgap timeframe between his release and his entry into inpatient substance abuse treatment, he will not "fight the GPS just to show that he has nothing to hide from anybody with that."  Tr. at 29:22-30:1 (Esquibel).  The Court believed that fact has influenced the United States' position, because it has argued the exhaustion requirement forecloses release in other cases without saying it would release prisoners as long as they wear GPS monitors, but the Court is unsure if this fact will factor into the legal analysis.  See Tr. at 31:2-16 (Court).  After ensuring that neither party has any questions remaining, the Court ended the hearing.  See Tr. at 30:2-31:5 (Court, Armijo, Esquibel, Garduño).

## LAW REGARDING RULE 12(h)(3) AND SUBJECT-MATTER JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331 and 1332.

Pursuant to rule 12(h)(3) of the Federal Rules of Civil Procedure, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Objection to a federal court's subject-matter jurisdiction "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).  See Kontrick v. Ryan, 540 U.S. 443, 455 (2004)("A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."); Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884)(holding that the nature and limits of federal judicial power require the court to raise the issue of subject-matter jurisdiction sua sponte).

Whenever the court lacks jurisdiction of the subject matter involved in an action, the court must dismiss the action.  See Tuck v. United Services Auto. Ass'n, 859 F.2d 842, 844 (10th Cir. 1988).  The party seeking the exercise of jurisdiction bears the burden of establishing jurisdiction and "must allege in his pleading the facts essential to show jurisdiction."  United States ex rel.

General Rock & Sand Corp. v. Chuska Dev. Corp., 55 F.3d 1491, 1495 (10th Cir. 1995)(citation and internal quotations omitted).  In determining whether a party has adequately presented facts sufficient to establish jurisdiction, the court should look to the complaint's face, see Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972), accepting the well-pleaded factual allegations as true, see United States v. Rodriguez-Aguirre, 2634 F.3d 1195, 1203 (10th Cir. 2001), but ignoring conclusory allegations of jurisdiction, see Groundhog v. Keeler, 442 F.2d 674, 677 (10th Cir. 1971).  "[D]ismissals for lack of jurisdiction should be without prejudice because the court, having determined that it lacks jurisdiction over the action, is *incapable* of reaching a disposition on the merits of the underlying claims."  Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir.2006)(emphasis in original).

## LAW REGARDING COMPASSIONATE RELEASE UNDER THE FIRST STEP ACT

Section 3582 governs compassionate release.  The First Step Act of 2018, Pub. L. No. 115-39132 Stat 5194 (December 21, 2018)("First Step Act"), amended § 3582 in part, to "increase the use and transparency of compassionate release."  Before the First Step Act, 18 U.S.C. § 3582 permitted only the BOP Director to ask the court for a defendant's compassionate relief.  The First Step Act adds the following language: "or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  First Step Act.  This language allows the defendant to petition the court for compassionate release after exhausting administrative remedies.

Some courts have determined that they can waive the exhaustion requirement.  See United States v. Perez, No. 17-CR-513-3, 2020 WL 1546422, at *2 (S.D.N.Y. April 1, 2020)(Torres, J.); United States v. Colvin, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. April 2,

2020)(Arterton, J.)("[I]n light of the urgency of Defendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the Court waives the exhaustion requirement of Section 3582(c)(1)(A)."). Courts within the United States Court of Appeals for the Tenth Circuit, however, have concluded, even amidst the COVID-19 pandemic, that the exhaustion requirement is not subject to waiver. See United States v. Heath, No. CR-13-102-SLP, 2020 WL 1957916, at *2 (W.D. Okla. April 23, 2020)(Palk, J.)(collecting cases)(citing United States v. Bell, No. 16-20008-02-DDC, 2020 WL 1923086, at *2 (D. Kan. April 21, 2020)(Crabtree, J.); United States v. Gonzalez, No. 18-cr-00310-PAB, 2020 WL 1905071, at *2-3 (D. Colo. April 17, 2020)(Brimmer, C.J.); United States v. Perry, No. 18-cr-0480-PAB, 2020 WL 1676773, at *1 (D. Colo. April 3, 2020)(Brimmer, C.J.)).

Caselaw at the Courts of Appeals level is scarce. In United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020), the United States Court of Appeals for the Third Circuit characterizes § 3582(c)(1)(A)'s exhaustion requirement as "a glaring roadblock foreclosing compassionate release." United States v. Raia, 954 F.3d at 597. The Third Circuit does not state definitively whether it believes the exhaustion requirement is jurisdictional. It states, however, that remand to the district court "would be futile," because the defendant did not comply with § 3582(c)(1)(A)'s exhaustion requirement. United States v. Raia, 954 F.3d at 597. Some courts have interpreted this statement as the Third Circuit treating the exhaustion requirement as jurisdictional, see United States v. Davis, No. 19-CR-64-F, 2020 WL 2465264, at *2 (D. Wyo. May 13, 2020)(Freudenthal, J.)(stating that "the only circuit court opinion on this issue" concludes that the "30 day waiting period (or exhaustion of all administrative remedies) is jurisdictional")(citing United States v. Raia, 954 F.3d at 597), although a reasonable mind could conclude that a failure to meet the

exhaustion requirement, as a threshold matter, prevents the court from reaching the merits. Certainly the Third Circuit's conclusion that remand is futile when the defendant has not fulfilled the exhaustion requirement suggests it is jurisdictional, because the Third Circuit is excluding the possibility of the court waiving the exhaustion requirement.

The United States Court of Appeals for the Fifth Circuit recently touched upon whether the exhaustion requirement is jurisdictional.  In Valentine v. Collier, 956 F.3d 797 (5th Cir. 2020), the Honorable Stephen A. Higginson, United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, suggests that courts could excuse the First Step Act's exhaustion requirement.  See Valentine v. Collier, 956 F.3d at 807.  In his concurrence, Judge Higginson notes that several courts have concluded that the exhaustion requirement "is not absolute and that it can be waived by the government or by the court, therefore justifying an exception in the unique circumstances of the COVID-19 pandemic."  See Valentine v. Collier, 956 F.3d at 807 (citing e.g. United States v. Russo, No. 16-cr-441 (LJL), 2020 WL 1862294, at *405 (S.D.N.Y. April 14, 2020).  Judge Higginson's citation to these cases suggests that he agrees that either courts or the United States can excuse the exhaustion requirement.

In United States v. Alam, 960 F.3d 831 (6th Cir. 2020), the Honorable Jeffrey Sutton, United States Circuit Court Judge for the United States Court of Appeals for the Sixth Circuit, concludes that the First Step Act's exhaustion requirement was not jurisdictional.  See 960 F.3d at 833.  He notes that, as the Supreme Court has tried to clarify jurisdictional rules and jurisdictional mandatory rules over the past decade, "key" differences between the two rules have emerged.  See 960 F.3d at 833 (citing Arbaugh v. Y & H Corp, 546 U.S. 500, 516 (2006)).[3]  He focuses on one

---

[3]The United States Court of Appeals for the Tenth Circuit finds this line of Supreme Court cases to be less clear about whether federal rules of procedure are jurisdictional:

It is difficult to view as fully consistent with its own precedents the Supreme Court's recent insistence that only those procedural rules implementing a statutory directive can be jurisdictional in nature. For example, <u>Bank of Nova Scotia v. United States</u>, a decision that has never been overruled by the Court, holds as follows:

> We . . . hold that a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a). Rule 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The Rule was promulgated pursuant to 18 U.S.C. § 687 (1946 ed.) (currently codified, as amended, at 18 U.S.C. § 3771), which invested [the Supreme Court] with authority "to prescribe, from time to time, rules of pleading, practice, and procedure with respect to any or all proceedings prior to and including verdict...." Like its present-day successor, § 687 provided that after a Rule became effective "all laws in conflict therewith shall be of no further force and effect." It follows that Rule 52 is, in every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions. The balance struck by the Rule between societal costs and the rights of the accused may not casually be overlooked because a court has elected to analyze the question under the supervisory power.

487 U.S. 250, 254-55 (1988) (quotation omitted); <u>see also</u> <u>In re Grand Jury Proceedings</u>, 616 F.3d 1186, 1197-98 (10th Cir. 2010)(holding that the Rules Enabling Act authorizes the Supreme Court to "prescribe rules that affect[ ] statutory-based jurisdictional time limits").

Perhaps the Supreme Court's case law in this arena could best be understood as somewhat cohesive by recognizing that the distinction between jurisdictional limitations and claim-processing rules examined in the <u>Eberhart-Kontrick-Bowles</u> line of cases is not fully descriptive of the range of possibilities for the various federal rules. That is, some rules of procedure, like those at issue in <u>Eberhart</u> and <u>Kontrick</u>, are directed toward the parties and, unless raised by the parties, are subject to waiver and forfeiture. Other rules, like the rule at issue in <u>Kontrick</u>, enforce a historic limitation on a federal court's jurisdiction. Finally, some rules, like the one at issue in <u>Bank of Nova Scotia</u> and the one at issue here, are directed squarely at a federal court's ability to access any inherent authority it otherwise might possess. In the words of <u>Bank of Nova Scotia</u>, these types of rules have struck a balance "between societal costs and the rights of the accused" that federal courts are not entitled to overlook. 487 U.S. at 255.

- 16 -

difference: courts must raise jurisdictional defects sua sponte and cannot permit the parties to waive or ignore these defects, whereas courts must resolve mandatory-claim-processing defects only when the parties raise them.  See 960 F.3d at 833 (citing Gonzalez v. Thaler, 565 U.S. 134, 141 (2012); Eberhart v. United States, 546 U.S. 12, 19 (2005)(per curiam)).

Judge Sutton notes that courts should treat a prescription as jurisdictional "only if 'the Legislature clearly states that [the] prescription counts as jurisdictional.'"  United States v. Alam, 960 F.3d at 833 (quoting Fort Bend County v. Davis, 139 S. Ct. 1843, 1850 (2019)(alterations in United States v. Alam)(stating that courts should not categorically equate a limit on power with a limit as subject-matter jurisdiction).  Looking at the text of the exhaustion requirement, Judge Sutton concludes that, because the provision "neither 'speak[s] in jurisdictional terms' nor 'refer[s] in any way to the jurisdiction of the courts," the provision appears to be a claim-processing rule and functions as a claim-processing rule.   See 960 F.3d at 833 (quoting Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394 (1982))(alterations in United States v. Alam).  Judge Sutton cites for support analogous provisions and their corresponding Supreme Court interpretations concluding that the provisions are not jurisdictional: (i) Title VII's non-jurisdictional exhaustion requirements that requires a claimant to present his or her claim to Equal Employment Opportunity Commission and wait until either the EEOC has acted on it or 180 days have passed and Ford Bend Cty., Tex. v Davis, 139 S. Ct., 1843 1851-52 (2019); (ii) PLRA's administrative-exhaustion requirement and Woodford v. Ngo, 548 U.S. 81, 101 (2006); (iii) the Clear Air Act's non-jurisdictional requirement that, during a public comment period, plaintiffs object to the rule with reasonable specificity and EPA v. EME Homer City Generation, L.P., 572 U.S. 489, 511-12

United States v. Spaulding, 802 F.3d 1110, 1119 n.9 (10th Cir. 2015).

(2014); and (iv) the Copyright Act's non-jurisdictional requirement that plaintiffs must register a copyright before filing an infringement claim and Reed Elselvier, Inc. v. Muchnick, 559 U.S. 154, 168 (2010). See United States v. Alam, 960 F.3d at 833.

## ANALYSIS

The Tenth Circuit has not determined yet whether the administrative exhaustion requirement for compassionate release is jurisdictional. See United States v. Davis, No. 19-CR-64-F, 2020 WL 2465264, at *2 (D. Wyo. May 13, 2020). Thus, the Court conducts that analysis. The Supreme Court has spent several years distinguishing between jurisdictional and claim-processing rules, and consequently narrowing the definition of jurisdictional rules. See Robles-Garcia v. Barr, 944 F.3d 1280, 1283 (10th Cir. 2019)(citing Sky Harbor Air Serv., Inc. v. Reams, 491 F. App'x 875, 891, n.17 (10th Cir. 2012)(unpublished)). A "'rule is jurisdictional if the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional,' '[b]ut if Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional.'" Robles-Garcia v. Barr, 944 F.3d at 1284 (quoting Gonzalez v. Thaler, 565 U.S. at 141-42). If a rule is jurisdictional, courts do not have discretion to "'create equitable exception to jurisdictional requirements.'" Robles-Garcia v. Barr, 944 F.3d at 1284 (quoting Bowles v. Russell, 551 U.S. 205, 213-14 (2007)). When determining whether a statutory limitation is jurisdictional in nature, the Tenth Circuit examines the "restriction's 'textual, contextual, and historical backdrop.'" United States v. Spaulding, 802 F.3d 1110, 1120 (10th Cir. 2015)(quoting United States v. McGaughy, 670 F.3d 1149, 1156(10th Cir. 2012))(further internal quotations omitted).

The text itself is the first step in determining whether the administrative-exhaustion requirement is jurisdictional. When the statute's text is "plain and unambiguous," the court must

follow the text, because "we assume 'the ordinary meaning of that language accurately expresses the legislative purpose.'" Renewable Fuels Assoc. v. U.S. Envtl. Protection Agency, 948 F.3d 1206, 1243 (10th Cir. 2020)(quoting Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251 (2010)). When determining whether the statutory language is plain and unambiguous, the court "'must read the words in their context and with a view to their place in the overall statutory scheme.'" Renewable Fuels Assoc. v. U.S. Envt'l Protection Agency, 948 F.3d at 1242 (quoting King v. Burwell, 135 S. Ct. 2480, 2489 (2015)(internal citations and quotation marks omitted in Renewable Fuels Assoc. v. U.S. Envt'l Protection Agency). Because the court should "'fit, if possible, all parts into an harmonious whole,'" Renewable Fuels Assoc. v. U.S. Envtl. Protection Agency, 948 F.3d at 1243 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000), the court must "'construe statutes, not isolated provisions,'" Renewable Fuels Assoc. v. U.S. Envtl. Protection Agency, 948 F.3d at 1243 (quoting Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010)).

Tenth Circuit caselaw suggests the text indicates that the provision is jurisdictional, even without using the word "jurisdiction." The Tenth Circuit has concluded that the statute's language need not contain the word "'jurisdiction'" for the text to restrict the court's jurisdiction. United States v. Spaulding, at 1120 (quoting United States v. McGaughy, 670 F.3d at 1156 (stating that, for a statutory restriction to be jurisdictional, the statute needs to contain "clear jurisdictional language," but it "need not go so far as to use the magic word 'jurisdiction'")). But see Robles-Garcia v. Barr, 944 F.3d at 1280 (suggesting that, were the Tenth Circuit acting on a clean slate, it would conclude a statute's exhaustion requirement is not jurisdictional, in part, because the statute did not use the term "jurisdiction"). Thus, the statute's omission of the word "jurisdiction" does not, under Tenth Circuit precedent, preclude the possibility that the provision is jurisdictional.

Looking beyond the word "jurisdiction," the Tenth Circuit considers whether the text is directed toward the court or to the parties.   United States v. Spaulding, 802 F.3d at 1132 n.4 (Gorsuch, J.)(dissenting)(agreeing that the majority is "of course right that whether a statue's instructions are aimed at the court or the parties is a relevant consideration when weighing whether it has jurisdictional effect")(citing Hobby Lobby v. Sebelius, 723 F.3d 1114, 1157-58 (10th Cir. 2013)(Gorsuch, J.)(concurring)). When the statute's text is written in terms of what the court can do, and not what the defendant can do, the statute is more likely to be jurisdictional.  See United States v. Spaulding, 802 F.3d at 1132.   See also United States v. Alam, 2020 WL 2849654, at *2 (stating that "[n]othing in the administrative exhaustion requirement clearly limits our jurisdiction," because it "merely imposes a requirement on prisoners before they may move on their own behalf").  The immediately relevant language is as follows:

> **(c)    Modification of an imposed term of imprisonment. --** The court may not modify a term of imprisonment once it has been imposed except that --
>
> > **(1)**     in any case --
> >
> > > **(A)**       **the court,** upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that --

18 U.S.C. § 3582(c)(1)(A)(emphases added).

Congress begins § 3582 with a "clear" limitation on the court's authority[4] by restricting the

---

[4] The Court recognizes the distinction between a court's authority and a court's jurisdiction.

court's ability to modify sentences and granting the court limited exceptions from the rule under which it may modify sentences.  See United States v. Read-Forbes, -- F. Supp. 3d. --, 2020 WL 1888856, at *3 (noting that § 3582's "'clear and mandatory restriction on a court's authority'" "'speak[s] to the power of the court rather than to the rights or obligations of the parties'")(quoting United States v. Spaulding, 802 F.3d at 1122; Landgraf v. USI Film Prods., 511 U.S. 244, 274 (1994)(alteration in United States v. Read-Forbes)(further internal quotations omitted)).  If the phrase directed towards the defendant is eliminated, the provision reads: "The court may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)"  That sentence remains a coherent whole.  In contrast, if the directive towards the court is eliminated, the provision reads:

> "[U]pon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

The provision is no longer a complete sentence, demonstrating that the directive towards defendants is modifying the main thrust of the statute -- the court's authority.  In contrast, if the

---

See United States v. Alam, 960 F.3d 831, 831 (6th Cir. 2020)("It's 'usually a mistake' to 'treat a statutory limit on our power as a statutory limit on subject-matter jurisdiction. . . .'  A prescription limits our subject-matter jurisdiction only if 'the Legislature clearly states that [the] prescription counts as jurisdictional.'").  When determining whether a § 3582 provision is jurisdictional, the Tenth Circuit interprets a court's authority to mean a court's jurisdiction, and thus the Court uses authority to mean jurisdiction when determining whether, under Tenth Circuit law, a statute is jurisdictional.  See United States v. White, 765 F.3d 1240, 1245 (10th Cir. 2014)(stating that "a district court's § 3582(c)(2) jurisdiction [is] a function of the court's *authority to grant* a sentence reduction," and, thus, "if a district court is not authorized to grant a sentence reduction, then the defendant is not eligible to receive one, and that [w]hat's important, in short is that the district court lacks jurisdiction to reduce the defendant's sentence")(emphasis in United States v. White)).

statute read,

> [b]efore the court can modify the sentence, the defendant must fully exhaust all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or there must be a lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,

the statute would center on the requirement Congress imposes on the defendant. Thus, § 3582(c) is framed, as a whole, in terms of what the court can do, and not in terms of what the defendant must do. See United States v. Spaulding, 802 F.3d at 1124 ("[Section] 3582(c) acts as a jurisdictional limitation on the ability of district courts to alter previously imposed sentences of imprisonment."). This framing suggests that, even in absence of the word jurisdiction, Tenth Circuit law suggests that the textual restriction is jurisdictional.

Further, when the text does not use the word jurisdiction, the Tenth Circuit looks at the text's context to determine whether the restriction is jurisdictional. When examining context, the Tenth Circuit examines the text's "'placement'" in the statute to determine whether the text plainly indicates jurisdiction. United States v. Spaulding, 802 F.3d at 1120 (quoting United States v. McGaughy, 670 F.3d at 1156). Some courts have looked at a provision's placement in the overall statutory scheme. For instance, the Honorable Jed Rakoff, United States District Court Judge for the Southern District of New York, concludes that § 3582(c)(1)(A)'s placement indicates that it is not a jurisdictional restriction, because the provision is not "'part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment.'" United States v. Haney, -- F. Supp. 3d --, 2020 WL 1821988 (S.D.N.Y. April 13, 2020)(Rakoff, J.). The Tenth Circuit, in contrast, looks more narrowly at a provision's location when determining whether the provision was jurisdictional. "'If the restriction is connected to a grant of jurisdiction, then the restriction is likely meant to qualify that grant; but if the restriction is set off from a grant of

jurisdiction, it may be non-jurisdictional.'" United States v. Spaulding, 802 F.3d at 1120 (quoting United States v. McGaughy, 670 F.3d at 1156).  In United States v. Spaulding, the Tenth Circuit concludes that § 3582(c)(1)(B) is connected directly to the grant of jurisdiction -- § 3582's statement that the court cannot modify a sentence – and, thus, regardless of the statute's separate chapter for jurisdiction in the criminal code, that § 3582's jurisdictional grant rendered § 3582(c)(1)(B) plainly jurisdictional.  United States v. Spaulding, 802 F.3d at 1120.  Section § 3582(c)(1)(A) is situated identically relative to § 3582's grant of jurisdiction, and thus, according to Tenth Circuit precedent, its position renders its jurisdictional.

The Tenth Circuit's interpretation of other § 3582 provisions provides further context for § 3582(c)(1)(A).  See United States v. Davis, 2020 WL 2465264, at *2 (quoting United States v. Read-Forbes, 2020 WL 1888856, at *3).  Although the Tenth Circuit has not addressed whether §3582(c)(1)(A) is jurisdictional, before the First Step Act's enactment, the Tenth Circuit determined that  § 3582(c)(1)(B) is jurisdictional.  See United States v. Spaulding, 802 F.3d at 1122 (citing United States v. Vaker, 769 F.3d 1196, 1198 (10th Cir. 2014)).  In United States v. McGaughy, the Tenth Circuit concludes that § 3582(c)(1)(B) "operates as a 'clear' and mandatory restriction on a court's authority."  United States v. McGaughy, 670 F.3d at 1158 (quoting Gonzalez v. Thaler, 565 U.S. at 649).  Although the Tenth Circuit announced its conclusion before the First Step Act's enactment, § 3582's structure has not changed in the interim.  The relevant text of § 3582(c)(1) is as follows:

    **(c)**    **Modification of an imposed term of imprisonment.** -- The court may not modify a term of imprisonment once it has been imposed except that—

        **(1)**    in any case --

    . . . .

            **(B)**    the court may modify an imposed term of

> imprisonment to the extent otherwise expressly
> permitted by statute or by Rule 35 of the Federal
> Rules of Criminal Procedure; and

18 U.S.C. § 3582.  The Tenth Circuit concludes that the statute, which twice frames its directives in terms of what the court can do, "serves as the grant of authority," and thus the provision is jurisdictional.   United States v. McGaughy, 670 F.3d at 1158 (stating that the § 3582(c)(1)(B) serves gives Rule 35(a)'s deadline "jurisdictional force").  The Tenth Circuit further concludes that rule 35 of the Federal Rules of Criminal Procedure, which the statute incorporates as an exception to the rule when the court can modify an imprisonment term, is jurisdictional, because it is part of the provision that grants the court authority, and thus it is not "'set off' from jurisdictional provisions."  United States v. McGaughy, 670 F.3d at 1158.  Similarly, § 3582 (c)(1)(A) shares an identical framing as § 3582(c)(1)(B) -- it also twice frames its directives in terms of what the court can do.  Section 3582(c)(1)(A) also is part of the provision that grants the court authority, and thus is not isolated from jurisdictional provisions.  Thus, that the Tenth Circuit concludes in a similar context a provision was jurisdictional indicates that the Tenth Circuit would conclude that § 3582(c)(1)(A) is jurisdictional.  Although other district courts in the Tenth Circuit do not bind the Court, it is worth mentioning that these courts also have determined that § 3582 is jurisdictional under Tenth Circuit caselaw.  See United States v. Read-Forbes, 2020 WL 2465264, at *2 (citing United States v. White, 765 F.3d 1240, 1250 (10th Cir. 2014)(concluding that a case should have been dismissed because of lack of jurisdiction when the defendant was not eligible for a sentence reduction under 3582(c)(2)); United States v. McGaughy, 670 F.3d at 1158 (stating that rule 35(a),which 3582(c)(1)(B) incorporates and which contains "the time limitation and to grant of authority in a single sentence," "suggest[s] the intent to constrain the court's authority to act outside the prescribed time limits").  Further, when conducting a historical assessment of §

3582, the Tenth Circuit "'has already concluded the statute represents a recognition on the part of Congress of the courts' historical 'inherent power to correct clearly erroneous sentences,'" United States v. Spaulding, 802 F.3d at 1124 (quoting United States v. McGaughy, 670 F.3d at 1158), but that the statute's terms "make clear that Congress intended to limit the exercise of that inherent power," United States v. Spaulding, 802 F.3d at 1124.

If the Court were writing on a clean slate, however, it would conclude that § 3582 is not jurisdictional. The Supreme Court has been explicit: if the statutory text does not plainly state that a restriction is jurisdictional in nature, the provision is not jurisdictional in nature. See United States v. Kwai Fun Wong, 575 U.S. 402, 409-10 (2015)("Absent such a clear [jurisdictional statement], courts should treat the restriction as nonjurisdictional. That does not mean Congress must incant magic words. But traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences."). If the Court read the word "authority" as "jurisdiction," then perhaps the jurisdictional language would be plain. Distinguishing between those two words, however, extinguishes the language's unambiguity.

The word jurisdiction and any of its equivalents are not found in the text. Only structural implications and context clues nudge the reader to construe the statute as jurisdictional. Although helpful, implications and clues are not plain language. The Court speculates that, were the precedents of the Tenth Circuit not binding on it, it might agree with the Court that the text is not plainly jurisdictional. The Tenth Circuit recently has expressed dissatisfaction when concluding that a provision was jurisdictional, in part because the Supreme Court "has warned us that we should be sparing in our use of the word jurisdiction," Robles-Garcia v. Barr, 944 F.3d at 1283 (citing Fort Bend Cty. v. Davis, 139 S. Ct. 1843, 1848-50 (2019); Gonzalez v. Thaler, 565 U.S. at 141-42; and Sky Harbor Air Serv., Inc. v. Reams, 491 App'x 875, 891 n. 17 (10th Cir.

2012)(unpublished)), and in part because the provision at issue did not use the word "jurisdiction," Robles-Garcia v. Barr, 944 F.3d at 1283 (citing Gonzalez v. Thaler, 565 U.S. at 141-42.  Past Tenth Circuit interpretations of the provision at issue declare it jurisdictional, so precedent "make[s] clear that we cannot [address the argument] because failure to exhaust an issue, as [the statute] requires in the immigration removal context, deprives us of 'jurisdiction'[5] to consider that issue."  Robles-Garcia v. Barr, 944 F.3d at 1283.  Thus, although, if the Tenth Circuit "had discretion, [it] might decide that it would be most expedient for us to address the . . . unexhausted argument now," "we lack jurisdiction to review."  Robles-Garcia v. Barr, 944 F.3d at 1283.  That the Tenth Circuit devotes three paragraphs -- albeit brief paragraphs – stating why it would conclude that the provision is not jurisdictional underscores its dissatisfaction at the broad strokes it has used to paint "jurisdiction" over statutes omitting that word.  The Tenth Circuit might be similarly reluctant to deem § 3582(c)(1)(A) jurisdictional, because the Supreme Court has cautioned about the liberal nature with which courts find a statute jurisdictional, and because § 3582(c)(1)(A) omits the word jurisdiction and its equivalents.

During the deluge of compassionate release cases during the COVID-19 pandemic, a body of § 3582(c)(1)(A) caselaw has been emerging rapidly within the Tenth Circuit.  All district courts within the Tenth Circuit have, so far, determined that the courts cannot waive the jurisdictional requirement.  See, e.g., United States v. Heath, 2020 WL 1957916, at *2 (quoting Malouf v. SEC, 933 F.3d 1248, 1256 (10th Cir. 2019)(citing Ross v. Blake, 136 S.Ct. 1850, 1856-57 (2016)).  Most of these district courts have concluded that courts lack jurisdiction to hear cases in which the

---

[5]The Tenth Circuit's gratuitous quotation marks around the word "jurisdiction" may hint at its exasperation with its past holdings.

defendant has not fulfilled the exhaustion requirement, because the Tenth Circuit has held that reducing a defendant's sentence under other § 3582 subsections is jurisdictional, and because there is "no reason to treat [§ 3582(c)(1)(A)] any differently."  United States v. Read-Forbes, No. CR 12-20099-01-KHV, 2020 WL 1888856, at *3 (D. Kan. April 16, 2020), reconsideration overruled, No. CR 12-20099-01-KHV, 2020 WL 2037053 (D. Kan. April 28, 2020)(citing e.g. United States v. Boyles, No. 18-20092-JAR, 2020 WL 1819887, at *2-3 (D. Kan. April 10, 2020)).

Tenth Circuit precedent binds the Court regardless how much the current Tenth Circuit or the Court likes it, and so the Court treats § 3582(c)(1)(A) as a jurisdictional provision limiting its subject-matter jurisdiction.  This conclusion has important implications.  Jurisdiction refers to "a court's adjudicatory authority," Reed Elsevier, Inc. v. Muchnick, 559 U.S. at 160, subject-matter jurisdiction specifically "refers to 'the courts' statutory or constitutional power to adjudicate [a] case," Kan. by and through Kan. Dep't for Children and Families v. SourceAmerica, 874 F.3d 1226, 1240 (10th Cir. 2017), and federal courts have limited jurisdiction -- they "'possess only that power authorized by Constitution and statute,'" Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 546 (2005)(quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).  See Gad v. Kan. State Univ., 787 F.3d 1032, 1035 (10th Cir. 2015).  Thus, if a party does not meet a jurisdictional requirement, a federal court must dismiss the motion for lack of subject-matter jurisdiction, regardless whether the court or the parties wish to waive the requirement.  If the provision were a claim-processing rule, which queues the steps of litigation in an orderly manner, the Court need enforce it only when a party raises it.  See Martinez-Perez v. Barr, 947 F.3d 1273, 1279 (10th Cir. 2020)(citing Fort Bend Cty. v. Davis, 139 S. Ct. at 1849); Malouf v. Sec. and Exchange Comm'n, 933 F.3d 1248, 1258 n.10 (10th Cir. 2019)(citing Manrique v. United States, 137 S.Ct. 1266, 1271 (2017)).  Even when a claim-processing rule is "'framed in mandatory

terms,'" a party's failure to follow that rule does not "'deprive a court of authority to hear a case.'"
Martinez-Perez v. Barr, 947 F.3d at 1279 (quoting United States v. Kwai Fun Wong, 575 U.S. 402,
402 (2015)).  Because § 3582(c)(1)(A) invokes the court's subject-matter jurisdiction, however,
the Court cannot waive it away.  See Muskrat v. Deer Creek Pub. Sch., 715 F.3d 775, 783-84
(quoting Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011)(stating that courts "must raise and
decide jurisdictional questions that the parties either overlook or elect not to press").  Thus,
Garduño must fulfill the exhaustion requirement for the Court to have subject-matter jurisdiction.

Garduño argues that the Court should excuse Garduño from the exhaustion requirement,
because he would "likely not get relief or hear back from BOP" before he completes the remaining
two weeks of his sentence, and because he has been housed in Cibola County Correctional Center
and Otero County since his revocation hearing, and thus was never in BOP custody.  Amended
Motion at 2-3.  Although the Court cannot excuse Garduño from fulfilling the exhaustion
requirement for futility reasons, the Court can construe his second argument as Garduño arguing
that he has fulfilled the exhaustion requirement, because he has no BOP warden from whom to
seek relief.  Recently, the Honorable Martha Vásquez, United States District Judge for the United
States District Court for the District of New Mexico faced a similar set of facts -- a federal prisoner,
who was in a county jail and whom the BOP did not plan to move to a federal BOP facility,
petitioned for compassionate relief.  See United States v. Lopez, No. 18-CR-2846 MV, 2020 WL
2489746, at *2 (D.N.M. May 14, 2020).  Judge Vásquez concluded that the defendant had met the
exhaustion requirement.  See United States v. Lopez, 2020 WL 2489746, at *2.  She noted:

> The reason for administrative exhaustion here is straightforward: because Mr.
> Lopez is not in federal custody, he is unable to apply for compassionate release
> through the BOP's normal administrative process.  See Doc. 56 Ex. 1 (email
> from BOP regional counsel advising defense counsel in this case that he is "not
> aware of any means that a warden at a county jail facility would have to act on a

compassionate release request"); Ex. 2 (letter from the United States Attorney's Office for the District of New Jersey conceding that a defendant in a different case had exhausted his administrative remedies because he could not apply for compassionate release while in local custody). The government has additionally represented that because the BOP is not currently moving inmates between facilities, it has "no active plans [to move Mr. Lopez] to a federal BOP facility." See Doc. 57 at 1. Both parties accordingly agree that because Mr. Lopez has no way to apply to compassionate release through the BOP, he has satisfied § 3582(c)(1)(A)'s exhaustion requirement and is eligible to apply for relief in this Court. See id. at 2, Doc. 56 at 4.

United States v. Lopez, No. 18-CR-2846 MV, 2020 WL 2489746, at *2 (D.N.M. May 14, 2020)(Vásquez, J.). That Garduño is not in BOP custody now is not necessarily determinative. Although it may not come to any such result, Garduño still must exhaust his administrative remedies to the fullest extent possible. Thus, even if the county warden to whom Garduño was supposed to petition is unable to act on a compassionate relief request at this time, Garduño still needed to wait thirty days after petitioning the warden to bring his case. Thus, Garduno has not fulfilled the exhaustion requirement.

If Court followed other courts who excused the exhaustion requirement as futile, because the only warden to whom the defendant could petition was a county warden, see, e.g., United States v. Arreola-Bretado, 445 F. Supp. 3d 1154, 1157 (S.D. Cal. 2020), the Court would next need to determine whether Garduño meets the § 3582 criteria for compassionate relief. A court can grant compassionate relief under § 3582 when the defendant demonstrates (i) "extraordinary and compelling reasons"; (ii) "applicable policy statements issued by the Sentencing Commission"; and (iii) "the factors set forth in [18 U.S.C. §] 3553(a)." 18 U.S.C. § 3582 (c)(1)(A)(i)-(ii). The statute instructs the Sentencing Commission to define "extraordinary and compelling reasons," which the Sentencing Commission defines in its commentary to § 1B1.13. 18 U.S.C. § 3582 (c)(1)(A)(i)-(ii). The Sentencing Commission gives four "extraordinary and compelling reasons":

(A) the defendant's medical condition that either is a terminal illness "(i.e., a serious and advanced illness with an end of life trajectory)", or a serious illness that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (B) the defendant's age; (C) family circumstances, including the "death or incapacitation of the caregiver of the defendant's minor child or minor children," or the "incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner"; and (D) other reasons as "determined by the Director of the Bureau of Prisons" that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Advisory Committee Notes § 1B1.13.

None of the advisory committee's notes to § 1B1.13's demarcated categories apply to Garduño. Subdivision (A) does not apply. Garduño has Hepatitis C, see PSR ¶ 109, 24, which is serious, but he does not allege that his Hepatitis C, even in combination with the threat of COVID-19, has diminished his ability to provide self-care, as § 1B1.13's requires. Further, although COVID-19 may pose a greater risk for people with liver disease, there is currently "no information about whether people with. . . hepatitis C are at increased risk for getting COVID-10 or having severe COVID-10." Center for Disease Control, COVID-19: People with Liver Disease, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last visited June 15, 2020)(noting that anyone with a severe underlying condition, including liver disease, "might be at higher risk of illness from COVID-19"). On its own, the unknown chance of a higher risk of COVID-19 complications does not warrant Garduño's release. Releasing Garduño based on COVID-19's speculative effects would open the floodgates of release, because the early stages of COVID-19 knowledge means that essentially every disease and disorder could

magnify COVID-19's effects.

Subdivision (B) also does not apply to Garduño, who is fifty years old, and thus fifteen years below Subdivision (B)'s age requirement. Subdivision (C) does not apply, because Garduño does not allege that his mother was the primary caregiver of his children. Section 1B1.13's Subdivision (D), is the only category that warrants a closer look in these circumstances.

Subdivision (D) permits the BOP to motion for release for an unlisted extraordinary and compelling reason, on its own or in combination with the reasons in Subdivision (A)-(C). Notably, this fourth, catch-all category states that the extraordinary and compelling reasons are "determined by the Director of the Bureau of Prisons." Advisory Committee Notes § 1B1.13. The Sentencing Commission wrote this definition before Congress enacted and the President signed the First Step Act, so it makes sense that, at a time when only the BOP could move for compassionate release that the BOP would decide whether the reasons warranted compassionate release. Garduño asks, however, the Court to make this determination. He is not alone reading "the court" or "the defendant" into the sentence; many courts around the country have added those words to the provision's text, glossing over the fact that the text has not been updated since the First Step Act was enacted. See, e.g., United States v. Sawicz, 2020 WL 1815851, at *2 (agreeing with the defendant that, although the defendant's hypertension does not place him squarely within any of the Policy Statement's definitions of "extraordinary and compelling reasons," COVID-19 and "his particularly vulnerability to complications from COVID-19 because of his hypertension" are sufficiently "extraordinary and compelling reasons'" to grant him compassionate release). The temptation to read in an amendment is understandable; the Sentencing Commission has not had a quorum since December 31, 2018, and thus is unable to amend the United States Sentencing Guidelines or release policy statements. Thus, a court might assume that, if the Sentencing

Commission could act, it would change the policy to reflect the changes that the First Step Act made.  The text, however, is clear, and the Court cannot make amend the text on the Sentencing Commission's behalf.

Regardless, the Court concludes that Garduño has not demonstrated an extraordinary and compelling reason for compassionate release.  The Court does not want its conclusion mistaken for a lack of sympathy with Garduño's situation, but the circumstances do not fit the definitions of extraordinary and compelling reasons.  Although Garduño's situation cannot be slotted neatly into any of Subdivisions (A) through (C), his situation is most related to Subdivisions (A) and (C), so the Court looks at those two subdivisions to see if they can, in the aggregate, justify compassionate release.  In terms of Garduño's health, cases in which COVID-19 is a factor for compassionate release require more than speculative complications.  See also United States v. Rodarmel, No. 15-10105-2-JTM, 2020 WL 2840059, at *2 (D. Kan. June 1, 2020)(Marten, J.)(noting that cases the defendant cited in which the court granted compassionate release at least in part on COVID-19 "not only [had defendants with] an elevated risk of serious complications from a Covid-19 infection, but those defendants had an extremely short term (five months or less) left on their sentences and in many cases the request for release was not opposed by the United States").  Moreover, the Court sympathizes with Garduño that he is not able to be with his family as they grieve for his mother, his family is waiting for his release before they begin to plan the funeral.  Garduño will be able to attend his mother's funeral.  Thus, Garduño is not necessarily at elevated risk for COVID-19 complications and is not at risk of missing his mother's funeral, so the Court cannot justify soundly compassionate release on the bases of these circumstances.

**IT IS ORDERED**  that the Emergency Motion for Compassionate Release, filed June 9, 2020 (Doc. 1250), and the Amended Emergency Motion for Compassionate Release, filed June

10, 2020 (Doc. 1251), are denied.

_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Fred Federici
   Attorney for the United States
      Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
   Assistant United States Attorneys
Las Cruces, New Mexico

*Attorneys for the Plaintiff*

R. Scott Reisch
The Reisch Law Firm, LLC
Denver, Colorado

--and--

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

*Attorneys for the Defendant*